Filed 1/26/26  In re Z.M. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re Z.M., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br>v.<br>J.G.,<br>        Defendant and Appellant. | A173511<br><br>(San Francisco City & County Super. Ct. No. JD23-3206) |

Approximately three months after the juvenile court terminated reunification services, J.G. (Mother) filed a Welfare and Institutions Code section 388 petition[1] requesting a change in visitation and six additional months of reunification services.  The court summarily denied the petition without an evidentiary hearing, and Mother appeals.  We affirm.

---

[1] All further statutory references are to the Welfare and Institutions Code.

BACKGROUND

This is the second case involving mother's youngest child Z.M. (Minor).[2] We incorporate by reference facts from our prior unpublished opinion, *J.G. v. Superior Court* (May 7, 2025, A172430).

*Proceedings Leading to Termination of Services*

After minor was detained, due to various issues regarding Mother's mental health, substance use, and domestic violence, as well as Mother leaving Minor and his sibling in maternal grandmother's care, "despite extensive concerns" about her ability to care for the children, Mother received over 18 months of services. (*J.G. v. Superior Court, supra*, A172430.)

*Review Period*

"In its six-month review report, the [San Francisco Human Services Agency (Agency)] reported Mother had been consistently attending parenting classes since December 2023. She had also been participating in a domestic violence group. There had been no new arrests during the reporting period, although a June 2024 police report indicated Mother had been involved in a domestic violence incident with her then-boyfriend, when he 'punched a hole in two doors,' 'shattered the shower glass door,' and 'threw kitchen knives' at Mother (June incident). The police report indicated Mother 'protected herself with a pan' and sought an emergency restraining order. Mother also reported the incident, stating a friend 'became aggressive sexually and started

---

[2] Mother has lost custody of minor's three oldest siblings. (See *In re Gabriel K.* (Sep. 11, 2020, A159108) [nonpub. opn.] [affirming order terminating parental rights to minor's siblings G.K.]; *In re Z.M.* (Mar. 27, 2025, A171125) [nonpub. opn.] [affirming order terminating parental rights to minor's three year-old brother, Zi.M. and noting Mother "ultimately agreed" adoption was in G.K.'s and A.R.'s best interest].)

destroying her home.' She maintained she had ' "cut them off completely" ' and ' "got a restraining order." '

"Mother had been working with a new therapist since March 2024. Mother's psychiatrist, Dr. Wozniak, reported Mother 'had not been seeing him and currently was not on medication.' However, they had recently had an appointment in June 2024, and the psychiatrist reminded Mother 'her psychological evaluation had recommended medication.' Mother did not follow-up regarding medication.

"Mother had missed eight out of 36 scheduled visits. She cancelled a 'few visits' with Minor and brother, after reporting she had to go to the emergency room because she had been experiencing 'dizzy spells and headaches.' She also e-mailed Minor's caregivers that she had ' "just found out I have brain damage due to my car accident and abuse and that it's incurable and I have 9 years to live. I just wanted to let you know." ' When the Agency requested a 'release of information' to talk with Mother's doctors, Mother responded she 'was fine and that, "the doctor had mixed up the charts." ' One visit was cancelled due [to] a court date, another because Mother did not have funds for transportation, and another because 'her dog made her late.'

"Mother had tested 20 times, during the reporting period. All tests were positive for marijuana, and one test was positive for alcohol.

"In an October 2024 addendum report, the Agency continued to recommend termination of services. Mother's therapist reported Mother was 'actively participating and making progress, but there is still a lot of work to be done on [Mother's] end.' Mother attended weekly anger management and 'domestic [violence] survivor's support' groups. Additionally, Mother was completing her 'Family Treatment Court commitment as scheduled.' Mother

reported she was no longer working with Dr. Wozniak, and she was 'self-medicating for her anxiety using marijuana.' Mother had tested 21 times during the reporting period, and all results were positive for marijuana, and one was also positive for alcohol.

"While Mother had 'demonstrated positive engagement in services and interactions at visits over this short time period,' the Agency remained concerned about Mother's 'long standing history with domestic violence, prior CWS history related to domestic violence, and as of this current case, leaving the minor alone with an unfit adult who has past CWS history.' The Agency continued to recommend termination of services as it had not observed Mother 'exhibit safe behaviors for an extensive amount of time.' Mother had last been involved in a 'domestic violence incident' in June—four months before the date of the report.

"In a January 2025 addendum report, the Agency's recommendation remained the same. Mother's 'domestic [violence] survivor's' support group leader reported Mother's attendance had been 'very inconsistent during this reporting period' and that she felt Mother had 'not [been] putting in the effort to break herself from the cycle of domestic violence.' Mother's therapist stated Mother had discussed 'decreasing her THC usage and revisiting getting psychiatric support to address her long standing diagnoses,' but that Mother did not often bring up issues with her 'long standing history with domestic violence.' Mother tested 15 times out of 18 scheduled drug tests— all were positive for marijuana, and two were positive for alcohol.

"The social worker had also followed up with Mother's psychologist, Dr. Watt, who had performed a second psychological assessment in March 2024, diagnosing Mother once again with bipolar disorder, posttraumatic stress disorder, and unspecified personality disorder. Dr. Watt stated Mother

'was in need of ongoing psychological and medication treatment.'  She recommended 'medications that targeted [Mother's] moods, anxiety, and depression.'  During a monthly compliance meeting, Mother noted that 'per her attorney's recommendation, she decided to re-explore the psychiatric treatment for her diagnoses,' and the Agency submitted a referral for a psychiatric evaluation.

"Although Mother continued to participate in some of her support services and engaged in 'high quality' visitation with Minor, the Agency remained concerned Mother had not 'completely mitigated the safety concerns that continue to keep the family involved with the Agency.'  Mother's longstanding domestic violence history, along with reports from service providers noting Mother 'does not prioritize her domestic violence . . . challenges,' gave the Agency 'reason to believe that those behavioral patterns have not been diminished.'  Additionally, Mother had been 'slow to adhere to [her psychologist's] recommendations for psychotropic medication to treat her mental health diagnoses,' and it was 'concerning that [Mother] has continued prolonged marijuana use as a form of self-medicating despite [her psychologist's] trepidations about [Mother's] use . . . impacting her mental health and being used as a primary coping mechanism.'

"At the combined six-month, 12-month, and 18-month review hearing, the court heard from Mother's evaluator, her social workers, and counsel.

"Mother's psychologist, Dr. Watt, testified as an expert 'on the psychological testing, evaluation, and interpretation for this hearing.'  Dr. Watt evaluated Mother in 2020 and in 2024.  In the most recent evaluation, Dr. Watt included an 'observation of parent-child interaction during one of the supervised visits.'  For both evaluations, Dr. Watt diagnosed Mother with bipolar disorder, posttraumatic stress disorder, and

unspecified personality disorder.  Dr. Watt stated symptoms related to bipolar disorder can include mood swings, erratic behaviors, agitation and impulse control, and often people with the disorder 'stop taking their medication.'  In Mother's history with the Agency, Dr. Watt saw those symptoms in Mother's 'erratic behaviors and aggressive behaviors that led to her arrest in the past' and in her 'poor judgment in terms of leaving her children with [maternal grandmother] who has a history of substance abuse and poor mobility that would impair her ability to take care of the young children.'  Dr. Watt opined Mother's history indicated 'symptoms of her psychological disorders have an impact on her overall functioning, and this will likely impact her parenting ability.'  Additionally, Mother's diagnosis of untreated unspecified personality disorder could be seen in Mother's serious impairments in relationships, such as 'getting involved in dysfunctional, volatile relationships.'  Dr. Watt recommended ongoing psychological and medication treatment.

"Dr. Watt did not diagnose Mother with substance use disorder.  But she was concerned about Mother's marijuana use and stated she was 'at high risk of developing serious addiction issues.'  Dr. Watt sent her evaluation to the social worker.  She recommended Mother be given verbal feedback regarding the results of the evaluations.  Although she does not normally go over the evaluation results with parents, Dr. Watt informed Mother at the beginning of both evaluations that she could contact her to go over the results.  Mother did not do so.  During the second evaluation, Mother mentioned that she felt she had been misdiagnosed during the 2020 evaluation.  Dr. Watt did not discuss Mother's diagnosis with her psychiatrist or her therapist, but stated it was not standard procedure for her to do so.

"When social worker Sharon Anderson first came into contact with Mother, Minor's brother was in Mother's care under a family maintenance plan. She remained the social worker when both the brother and Minor were removed in June 2023, and until July 2024. Initially, Anderson recommended domestic violence, drug testing, general counseling, a psychological evaluation, and psychotropic medication evaluation and monitoring. Anderson sent a copy of Mother's 2024 evaluation by Dr. Watt to Mother's attorney and her psychiatrist, Dr. Wozniak. Mother consistently tested positive for marijuana and occasionally tested positive for alcohol. After completing a substance abuse evaluation and assessment, it was recommended Mother complete an outpatient program. Mother had been seeing an individual counselor twice a month and had received supervised visitation with Minor. Anderson expressed concern that Mother had already taken a year and a half of domestic violence classes and graduated from a program but continued to engage in domestic violence incidents. Additionally, Mother had been involved in a car accident and had been arrested for driving under the influence.

"Taylor Swayzer took over as the case social worker in July 2024. Reunification services, including for a psychological assessment, psychiatric assessment for medication management, individual counseling, domestic violence counseling, and substance use testing, had already been ordered. Swayzer met with Mother once a month and discussed services. Mother provided her with updates. During Swayzer's tenure, visitation progressed to monitored community visitation. Mother wanted to progress to unsupervised, and the Agency was continuing to assess if that would be appropriate.

7

"Mother testified she took 'full responsibility for [her] actions,' and she asked the court to return Minor to her care.  She had stopped using marijuana in January 2025—two weeks before the hearing—'because of the safety of [her] behavior and for [her] children.'  She also no longer consumed alcohol.  Mother was 'very confused' about her diagnoses because she had been 'diagnosed by multiple different people.'  No one had 'actually sat down and explained to [her] what [she was] diagnosed with.'  She began seeing Dr. Wozniak six years ago and the 'only thing he diagnosed [her] with was adjustment disorder.'  In June 2024, D[r]. Wozniak wrote a letter stating he and Mother 'mutually agreed' she would not take any more medication.  Mother was not sure when they 'mutually' came to this decision, or if Dr. Wozniak knew about the June incident with her boyfriend.  Mother said she was 'open to the new opportunities and ways of maybe being on medication that can actually help [her].'  She stated she had 'misdiagnosed' herself when she told her social worker and Minor's caregiver that she had brain damage and only a few years left to live.

"Mother also testified she planned to avoid relationships involving domestic violence.  Before entering a relationship, she would 'seek into [herself],' 'read the bible,' and 'go grounding.'  She recognized 'the signs of somebody who could potentially be violent' but was 'still learning' some 'other ones.'  At the beginning of her therapy, she had talked 'a lot' about 'issues related to domestic violence.'  But 'since the incident in June, [she hadn't] felt a need to, but moving forward, we did discuss that there will be more discussions regarding DV and the signs around it.'  She had not been 'involved with anybody' for eight months.

"Lydia DeGois, Mother's case manager at Homeless Prenatal Program, stated she ran a weekly peer parent support group for women.  Mother

8

consistently attended.  DeGois described Mother and her participation in the group positively.  They talked about domestic violence 'almost every week.'  DeGois acknowledged, however, that she had no formal training and her advice to Mother was akin to 'mentor advice.'  DeGois was aware Mother's drug tests 'have came [*sic*] back positive for marijuana.'  Mother had 'tried to quit' marijuana 'a couple of times,' but was not 'able to fully quit.'  Finally, DeGois recalled Mother sharing her diagnoses with her, but could only recall 'depression for sure, PTSD.  Those are the two that I know for a fact.'

"After hearing from counsel, the court found there was a substantial risk of detriment to Minor's safety if he was returned to Mother's care.  Although Mother had 'made progress' and there were 'lots of positive developments in this case,' Mother had not made 'significant progress in resolving the problems that lead to the child's removal from the home.'  The court also found, by clear and convincing evidence, reasonable services had been offered throughout the duration of the case.  The 'requirements of mother's case plan were clear, and I think that the confusion, if any, regarding medication compliance was the result of mother being in denial about her mental health, and perhaps on Dr. Wozniak not having complete information, not because the agency did not provide services.'  The court disagreed with Mother's 'contention' that 'lack of a team meeting or a team approach' compelled a finding that she had not been offered reasonable services.  The court heard 'evidence justifying and explaining the . . . decisions around the team meeting, and . . . that the agency tried numerous times to get in touch with Dr. Wozniak.'  The court also found the Agency was 'justified in its decision not to progress visits given [Mother's] lack of progress on the domestic violence front, her decision to continue to use marijuana, and on her intransigence around mental health treatment.'  The court

additionally found extending services to 24 months was not in Minor's best interest, there were no exceptional circumstances warranting extending services, and there was no possibility of return in the next six months. Accordingly, the court terminated services and set the matter for a section 366.26 hearing." (*J.G. v. Superior Court, supra*, A172430, fns. omitted.)

Mother sought writ relief, and this court denied mother's petition for extraordinary relief on May 7, 2025. (*J.G. v. Superior Court, supra*, A172430.)

*Section 388 Petition*

Approximately three months after the juvenile court terminated reunification services, but before this court issued its opinion denying mother's petition for extraordinary relief, mother, on April 30, filed a request to change order pursuant to section 388.

Mother sought an additional six months of reunification services, an increase in visitation, that visitation be made unsupervised, and Agency discretion to progress to overnight visitation. Mother maintained there was a substantial probability of return of Minor to her in the next six months, and that the requested change in orders was in Minor's best interest because Mother had demonstrated, through visitation, "she is able to take care of the child," increasing visitation will "strengthen their bond," Minor would have "the opportunity to reunify" with Mother, and Minor had spent the first 14 months of his life in Mother's care.

In regard to the change of circumstances, Mother acknowledged she had missed approximately a month of visitation and services but stated maternal great grandmother had passed away and she had to travel to the East Coast for the funeral and "unfortunately encountered unforeseeable

10

delays returning from that trip." Mother maintained she had kept in contact with her service providers and engaged in ongoing services. Specifically, mother had "a meeting with Dr. Amy Watt"; "attended three sessions of the Building Safety Group, a domestic violence service"; although she had been "unable to complete the eight-week program due to unforeseeable transportation delays"; completed Family Treatment Court; completed a relapse prevention course, enrolled in the contingency management program, although she had missed "some sessions due to the unforeseeable transportation delays"; and continued "her weekly therapy."

The court scheduled a hearing to determine whether to grant an evidentiary hearing. In the interim, the Agency filed its section 366.26 report recommending termination of parental rights.[3]

Two weeks later, the court held a hearing on the section 388 petition. Mother's counsel began by noting the court had on February 4, 2025, terminated Mother's reunification services due to the Agency's concerns about mother's ongoing issues with her mental health, substance use, and domestic violence. Counsel acknowledged the June 2024 domestic violence incident but stated mother maintained she "did everything right in the face of that incident." The crux of counsel's argument was that the absence of intervening incidents showed a change in circumstances. Counsel asserted a "big part of [Mother's] case" was timing—in that there had not been enough time between the last incident "and the current day"—but now Mother has shown, through "nearly one full year from . . . the last bad incident that happened in this case," a change of circumstance. Similarly, as to Mother's

---

[3] The court subsequently terminated rights on September 18, 2025, and Mother appealed. That appeal, case No. A174382, is pending and is not yet fully briefed.

11

substance abuse and mental health, counsel noted "there is nothing currently before this court, indicating that that is an ongoing problem for which she still requires ongoing treatment. . . . [P]art of change in circumstances is that nothing negative has happened to my client, not because of any mental health issues, . . . and not because of domestic violence. The omission of bad things happening is the change of circumstances." Additionally, counsel noted Mother had continued with and completed Family Treatment Court on March 3, 2025.

Counsel next acknowledged Mother's month-long gap in services and visitation. However, counsel stressed Mother had "encountered tremendous issues regarding transportation back," both visitation and therapy had since resumed, and Mother had "maintained contact with her therapist" and the Agency during that month.

Counsel further asserted it was in Minor's best interest to reopen reunification services, because Mother was now pregnant, and assuming Mother's pregnancy came to term, Minor would benefit from seeing his younger sibling with Mother "presumably on a day-to-day basis." Additionally, counsel claimed Minor would be "emotionally" impacted by seeing "his mother raising his sibling, but not raising him." Counsel also reiterated Mother had raised Minor until "he was approximately 14 months old."

Counsel for the Agency argued that although Mother was "engaged in some services," the issues leading to dependency had not been resolved. Family Treatment Court "is a harm reduction system," but it did not mean Mother had "completely stopped using drugs," and the Agency did not have any evidence that was the case. Mother was "still working" on her mental health issues, and Mother had "missed visits," and so there was "no evidence

12

today that demonstrates that the circumstances have changed." Counsel asserted circumstances were "in the beginning stages of changing," and so the first prong had not been met. Nor had Mother met the second prong—that the request was in Minor's best interest. Counsel contended it was not in Minor's best interest to grant the request just because Mother is pregnant. Finally, although Mother's counsel argued there had been no new community incidents, counsel for the Agency noted Mother was now engaged. While it was the Agency's hope that Mother "is working towards identifying a better type of partner," "historically Mother has picked partners that have led to intimate partner violence."

Minor's counsel joined with the Agency in opposition to the request for an evidentiary hearing. Although counsel was "glad" Mother had not "had any major incidents involving intimate partner violence," counsel argued it was in Minor's best interest to proceed with the "post-adoption agreement in a place where he is being cared for and extremely bonded with caregiver and enjoys time with Mother, but the Mother's instability has unfortunately—he is just safer, and we raised that it is in his best interest, if he stays with his current caregiver." Additionally, counsel noted there was no information in Mother's section 388 petition about any drug tests or the level of her current use. Finally, it was "very concerning" that Mother had "unforeseen transportation delays," as a reason in "multiple sections of [her] 388" petition for why she did not complete or attend services. Counsel stated, this spoke to Mother's "ongoing instability and leaving for over a month," not because of the funeral, but because she did not have "the organizational skills to get

there and to get back." Counsel noted there were no details on why Mother could not return sooner.[4]

The court denied the section 388 petition without an evidentiary hearing. The court began by noting the case had been pending since July 2023 based on allegations of Mother's mental health, intimate partner violence, and substance use. At the combined six-, 12-, and 18-month hearing, the court concluded Mother had not made significant progress in alleviating the issues that brought the family to the Agency's attention, that returning Minor to Mother's care would create a substantial risk of detriment, and that there was no basis for an additional six months of services.

Now, on the eve of the section 366.26 hearing, the evidence, even "when liberally construed," did not mandate an evidentiary hearing. There was evidence at the termination of reunification services hearing, for example, that Mother was participating in Family Treatment Court and that she had completed "quite a lot of the course work and that she had been doing therapy." The court concluded the evidence showed "there are periods of times" where Mother is engaged in services and periods where she is not, for "whatever reason," which has been "a consistent patten [*sic*] in this case" and "demonstrates some instability" in Mother's life. At best, this showed changing and not changed circumstances. Nor did the court find Mother's pregnancy to be a "relevant material changed circumstance that would" require an evidentiary hearing.

The court also ruled Mother had not shown the request to be in Minor's best interest. It was not in Minor's best interest to prolong the period before

---

[4] Father was not present, but his counsel agreed the juvenile court should deny the petition and proceed with adoption.

the section 366.26 hearing to offer Mother additional services. The focus was now on Minor's permanency and stability, and although the court commended Mother's efforts, "those efforts do not take priority" over Minor's stability.

**DISCUSSION**

"Section 388 allows a parent to petition to change, modify, or set aside any previous juvenile court order. [Citation.] 'The petitioner has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances *and* (2) that the proposed modification would be in the best interests of the child.' " (*In re J.M.* (2020) 50 Cal.App.5th 833, 845 (*J.M.*); § 388, subd. (a).) "The juvenile court has discretion whether to provide a hearing on a petition alleging changed circumstances." (*In re Aljamie D.* (2000) 84 Cal.App.4th 424, 431.) However, a " ' "parent need only make a prima facie showing to trigger the right to proceed by way of a full hearing." ' " (*Id.* at p. 432.) "If the liberally construed allegations of the petition do not show changed circumstances such that the child's best interests will be promoted by the proposed change of order, the dependency court need not order a hearing." (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250; Cal. Rules of Court, rule 5.570(d)(1).)

"We normally review the grant or denial of a section 388 petition for an abuse of discretion." (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478.) This includes the juvenile court's summary denial of a section 388 petition without a hearing. (*In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1079.)

Mother requested the juvenile court reinstate reunification services for an additional six months and increase her visitation. The juvenile court summarily denied the petition after concluding Mother failed to state a prima facie case of changed circumstances or that the requested modifications

15

would be in Minor's best interest. In this context, the court does not abuse its discretion "if even a liberal interpretation of the proffered evidence of changed circumstances might not justify modifying the order terminating reunification." (*In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1414.) We conclude, even accepting Mother's proffered evidence as true, the evidence did not show changed circumstances that might justify modification of the juvenile court's prior orders.

Mother's petition alleged she had "a meeting with Dr. Amy Watt," although there was no mention of what the two discussed during the meeting; "attended three sessions of the Building Safety Group, a domestic violence service," although she had been "unable to complete the eight-week program due to unforeseeable transportation delays"; completed Family Treatment Court; completed a relapse prevention course; enrolled in the contingency management program,[5] although she had missed "some sessions due to the unforeseeable transportation delays"; and continued "her weekly therapy."

However, the record shows Mother had previously enrolled in and participated in many of these services. Indeed, Mother had completed her relapse prevention program less than three weeks after termination of services, and as the trial court noted, Mother had substantially completed Family Treatment Court prior to termination of services and completed it less than a month after services were terminated.

---

[5] It is unclear what this program addresses. The letter attached to Mother's petition states Mother enrolled in the program on January 17, 2025, had been consistent with her attendance, but had notified them she would be traveling on March 18, that she had stayed in contact during her absence, and that she expected to resume treatment upon her return on April 21. It is unclear if Mother did resume or complete the program.

The court concluded the evidence showed "there are periods of times" where Mother is engaged in services and periods where she is not, for "whatever reason," which has been "a consistent patten [*sic*] in this case" and "demonstrates some instability" in Mother's life. That pattern continued after termination of services. Mother filed her petition three months later and missed a month of services "due to unforeseeable transportation delays."[6] Although, we commend Mother on her continued progress and acknowledge Mother was out of town due in part to maternal great grandmother's funeral, we agree the evidence shows Mother's pattern of inconsistent engagement in services and instability in her life.

Mother compares her case to *J.M., supra*, 50 Cal.App.5th 833.

*J.M.* is distinguishable. There, the appellate court concluded the Mother's completion of all domestic violence training and lack of contact with the abusing father for over a year constituted a change in circumstance where domestic violence issues comprised "the entire basis for the sustained dependency petition." (*J.M., supra*, 50 Cal.App.5th at pp. 836, 346.) In reversing the order denying the Mother's section 388 petition, the court stated the mother had presented "ample evidence that she had addressed the sole basis for juvenile court jurisdiction—domestic violence—as well as every other concern cited by the court in its order terminating reunification services." (*J.M.*, at p. 846.) Namely, the Mother "had not been in contact with [the] Father for over a year, had completed all required domestic violence training, and nothing suggested [the] Mother was or had been in another potentially violent or abusive relationship. [¶] Moreover, [the] Mother offered . . . uncontroverted evidence that she had stable and permitted housing, participated in individual therapy, completed parenting

---

[6] Mother was "out of the state" from March 18 through April 22, 2025.

17

and anger management programs, . . . no longer needed any psychotropic medications or mental health services," and she had "been drug testing and receiving negative results." (*Id.* at pp. 842, 846.)

That is not the case here. Here, domestic violence was not the only basis for the dependency petition, rather as the parties acknowledged, there were three concerns serving as the basis for the dependency proceedings: substance use, mental health, *and* domestic violence issues. Mother asserts she has shown a change in circumstances, given the absence of incidents. However, beyond not being involved in further instances of intimate partner violence, Mother also needed to address the ongoing issues underlying the dependency proceedings. The absence of incidents does not mean any of the ongoing concerns were being fully addressed. As we noted, in the three months between termination of services and the filing of her section 388 petition, Mother had missed a month of services, including therapy and visitation. Additionally, although Mother testified at the combined review hearing, she had stopped using marijuana and no longer consumed alcohol, there was no evidence Mother had followed through with that pledge. Similarly, although Mother was again engaged in weekly therapy, there was no evidence that she was addressing domestic violence in her therapy, as she had testified she would begin doing. (*J.M., supra*, 50 Cal.App.5th at p. 848 [The question when addressing a section 388 petition seeking reinstatement of services is "whether the changes the parent made since then are substantial enough to overshadow that prior determination, such that reunification is now in the child's best interest."]; *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223 ["To support a section 388 petition, the change in circumstances must be substantial."].) Thus, the period of reengagement in

18

services here was not a substantial change, rather it reflected "changing" and not changed circumstances.

Given our conclusion that Mother did not meet her burden of showing there has been a change in circumstances, we need not discuss in detail whether Mother's petition also showed a prima facie case that the requested modification would be in Minor's best interest. (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1157 ["the parent must sufficiently allege *both* a change in circumstances or new evidence *and* the promotion of the child's best interests"]; Cal. Rules of Court, rule 5.570(d)(1) [juvenile court may deny a section 388 petition if petition "fails to state a change of circumstances or new evidence that may require a change of order . . . or fails to show that the requested modification would promote the best interest of the child"].)

Having concluded the proffered evidence, even if accepted as true, would not support the modification of the court's prior order, such evidence does not show a prima facie case for relief, and the juvenile court did not abuse its discretion by denying the petition without proceeding to a full evidentiary hearing.

## DISPOSITION

The order is affirmed.

19

_____
                                        Banke, J.

We concur:

_____
Humes, P. J.


_____
Langhorne Wilson, J.

A173511, In re Z.M.

20